## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

JAMES D. BROWN, JR.,    )
INDIVIDUALLY,      )
            )  Civil Action File No.:
    *Plaintiff*    )  3:10-cv-33-TWT
            )
v.           )
            )  JURY TRIAL
ROBBINS, LLC,     )  DEMANDED
            )
            )
            )  **FILED UNDER SEAL**
    *Defendant.*   )
_____)

## COMPLAINT

COMES NOW James D. Brown, Jr., and files this Complaint showing this Honorable Court as follows:

## PARTIES, JURISDICTION AND VENUE

### 1.

Plaintiff James D. Brown, is a citizen of the United States of America and resident of Temple, Georgia. He is a former employee of Robbins, LLC, where he worked as a process engineer and scheduler from October 2007 until Robbins terminated him on June 24, 2009.

1

**2.**

Defendant Robbins, LLC, is an Alabama corporation, with its principal place of business at 2306 S. Wilson Dam Road Muscle Shoals, AL 35661. Robbins, LLC, is registered to do business in the State of Georgia, and has a plant and does business at 280 Pequanoc Dr., Tallapoosa, Georgia, 30176, in Haralson County, which is in the Northern District of Georgia. Robbins, LLC, may be served through its registered agent, CT Corporation System, 1201 Peachtree Street, N.E., Atlanta, GA 30060. Upon proper service of the Summons and Complaint, Robbins, LLC, will be subject to the jurisdiction of this Honorable Court.

**3.**

Pursuant to 28 U.S.C. § 1331, Defendant Robbins, LLC, is subject to federal question jurisdiction in this Court because this action arises under laws of the United States, including 31 U.S.C. §§ 3729 and 3730, and other relevant federal statutes.

**4.**

Additionally, Defendant is subject to jurisdiction and venue in this Court where "one defendant can be found, resides, transacts business, or in which any act proscribed by section 3729 occurred."[1] Accordingly, jurisdiction is appropriate in

---

[1] 31 U.S.C.A. § 3732(a).

Georgia, and in the Northern District of Georgia, because, among other reasons, the product in question was manufactured here, and Robbins, Inc., transacts business and has a place of business here. Venue furthermore is proper in this District under 28 U.S.C. § 1391.

## Rule 9(B), Fed. R. Civ. P. Allegations

### 5.

Much of the documentary evidence necessary to prove the allegations contained herein is in the exclusive possession of the defendant.

### 6.

Moreover, Brown requested additional evidence and Defendant Robbins refused to provide it to him.

### 7.

Moreover, when Brown requested additional evidence, Defendant Robbins fired him and prevented him from being able to obtain any additional evidence.

### 8.

The allegations of fact in this Complaint are personally known to Brown unless identified as being made upon information and belief. Each allegation made on information and belief identifies a situation in which Brown has, based upon his

knowledge and experience, a reasoned factual basis to make the allegation, but lacks complete details.

## SUMMARY OF FACTUAL ALLEGATIONS

### The Sonar Nose Dome Contract

**9.**

In 2008, Goodrich Corporation received a five-year Indefinite Delivery, Indefinite Quantity contract, valued at up to $33,000,000, for deliveries of sonar composite domes (SCD) and sonar dome rubber windows (SDRW) for U.S. Navy surface combat ships. The Naval Surface Warfare Center, Crane, Indiana, is the contracting activity (N00164-08-D-GP21).

**10.**

The SCDs that Goodrich is manufacturing will be mounted on the keels of FFG-7 frigates. The SCDs are designed to provide optimal structural and acoustic performance for the frigates' sonar systems. According to Goodrich's own press release, sonar composite domes "provide significant savings on maintenance costs, and have the potential to last many years even under the demanding operating conditions faced by naval surface ships." <u>See</u> Press Release, att. as Exh. 1.

**11.**

The SDRWs that Goodrich is manufacturing will be bow-mounted on DD-963 and DDG-51 class destroyers as well as CG-47 class cruisers. According to Goodrich's own press release, the SDRW "is a specialized rubber-wire reinforced structure that houses a ship's sonar system. The rubber's unique energy absorption and reflection properties enhance the sonar system's detection capability." Id.

**The Design and Manufacture of Sonar Domes**

**12.**

A sonar dome is an acoustically transparent housing that surrounds a ship's sonar transducer array. The sonar transducer array is used for detection, navigation and ranging. The dome is located below the waterline, and it permits acoustic energy to pass through to the array with minimal sound degradation.

**13.**

A Naval frigate uses the sonar equipment inside the dome to, for example, detect enemy submarines or underwater hazards.

**14.**

If the sonar dome fails to perform its proper function, the frigate's sonar abilities, including its ability to detect threats to the lives and safety of American Naval officers and sailors, will be compromised.

**15.**

Additionally, the sonar dome is designed to protect the sensitive interior equipment from the shock of an underwater explosion, such as a depth charge. The dome contains layers of fluid, which are intended to absorb the shock of an explosion. If the dome fails to function properly, the interior equipment can be damaged or destroyed, again jeopardizing the safety and lives of American Naval officers and sailors.

**16.**

According to Jim Pollock, Vice President for Goodrich's Engineered Polymer Products team: "Our proven ability to provide advanced acoustic products that maximize sonar system performance gives our sailors a significant tactical at-sea advantage." See Press Release, att. as Exh. 1.

**17.**

The sonar dome is manufactured in phases. In the initial phase, Goodrich layers a rubber compound into an enormous, bowl-shaped container that is approximately the size of a frigate's sonar nose dome. In the next phase, Goodrich layers another rubber compound on top of the first.

**18.**

Once the rubber layers are molded into the bowl-shaped container, additional layers, fluids and pieces of equipment are placed sequentially on top of the first two layers of rubber, until the sonar dome is completed.

**19.**

The outermost layer of the sonar dome is especially critical to the dome's performance.

**20.**

First, the outer surface of the sonar dome "is subject to fouling by marine organisms, such as barnacle, algae, tubeworm, bryozoan, and oyster, which interfere with sound transmission." Edelstein, Eller, & Grunther, <u>Fouling Resistant Elastomeric Material for Sonar Domes of Naval Surface Vessels</u>, Naval Engineers Journal 115, 116 (Feb. 1970). For that reason, the rubber that forms the outermost layer of the dome contains a chemical, Tributyltin oxide, which is intended to prevent the buildup of barnacles and other organisms on the nose dome.

**21.**

Additionally, cracking, peeling or erosion of the outer coating of the dome "induces turbulent flow over the damaged sonar dome surface and this turbulence, in turn, produces noise of such intensity that it severely interferes with the

operation of the sonar system." Cizek, Jr., and Petito, <u>Development of Improved Protective Coatings for Sonar Domes</u>, Naval Engineers Journal 593 (Aug. 1967), at 593-4. To avoid this interference, it is critical that the dome's outer layer remain smooth and intact.

### Robbins Contracts to Create the Rubber for the Outermost Layers of the Sonar Domes

**22.**

In February or March 2009, Robbins received a contract with Goodrich to produce the rubber compounds that would be used in the outermost layers of one or more of the sonar domes being manufactured by Goodrich.

**23.**

Robbins compound 35035 was to be the outermost layer of the sonar dome, and thus would be layered into the bowl-shaped container first as the dome was produced. Robbins compound 35029 then would be layered on top of 35035. After 35035 and 35029 were put into the bowl, Goodrich would add additional layers and equipment on top of the two Robbins compounds.

**24.**

Robbins knew and intended that Goodrich would use products 35035 and 35029 in manufacturing sonar domes for use in Naval frigates. In fact, John

McCoy, Robbins' maintenance supervisor, visited the Goodrich plant in Florida in order to learn more about the manufacturing process and requirements.

**25.**

Robbins knew and intended that Goodrich would use products 35035 and 35029 as the outermost layers of the sonar domes.

**26.**

In order to produce the 35035 and 35029 compounds, Robbins was to mix together a number of different ingredients according to a formula.

**27.**

Robbins planned to do the work at its Tallapoosa plant, although the Tallapoosa plant is not an accredited lab.

**28.**

Once products 35029 and 35035 were mixed, they had to be stored and then shipped in refrigerated compartments.

**29.**

Robbins fell behind in production because it encountered difficulties in arranging to meet the requirements for packaging and refrigerating the compounds once they were produced.

## Robbins Creates A Product Using An Out-Of-Date
## Material That Does Not Meet Contract Specifications

### 30.

Elastomag 170 is one of the ingredients in both products 35035 and 35029.

Elastomag 170 is a powdered form of a highly reactive grade of magnesium oxide

produced from magnesium chloride brine and dolomitic lime.

### 31.

Robbins did not have enough Elastomag 170 at the Tallapoosa plant to make

the full quantity of the 35035 and 35029 compounds that it had agreed to produce

for the sonar domes.  Robbins' Muscle Shoals plant, however, had a partial pallet

of Elastomag 170 left over from a prior application, and so Robbins had that partial

pallet shipped to Tallapoosa.

### 32.

Elastomag 170 has a shelf life of one year.  The manufacturer states

specifically: "Protect from air and moisture. Keep open bags tightly closed

between uses. Shelf life is 12 months under storage conditions stated above."  See

Manufacturer Warning, att. as Exh. 2.

**33.**

The Muscle Shoals Elastomag had been produced in 2007, and therefore was approximately two years old, i.e., approximately a full year past its acceptable shelf life.

**34.**

The lot number for the Muscle Shoals Elastomag contained a "7," which stood for the year of manufacture, 2007. The lot number is printed on both the paperwork and the side of the bags containing the product.

**35.**

On April 16, 2009, Robbins, LLC, finally mixed the 35035 and 35029 rubber compounds.

**36.**

Robbins used the in-date Elastomag 170 that the Tallapoosa plant had had on hand to make product 35029, and perhaps some of the batch of 35035. However, Robbins also used the old, out-of-date Elastomag 170 when it mixed product 35035.

**37.**

Ray Morris was the Robbins process engineer who oversaw the April 16, 2009, production of the 35035 and 35029 compounds for the Goodrich project.

**38.**

After the product had been mixed, Mr. Morris or some other person noticed that the 35035 mix had included the Muscle Shoals Elastomag 170 product that was outside its shelf life.

## Compound 35029 or 35035 Fails Product Testing

**39.**

Following the mixing, Robbins was required to test compounds 35029 and 35035 three times. ASTM test methodology requires that the "median" (not the average) result of the three tests must meet certain product standards.

**40.**

Either compound 35035 or compound 35029 failed the testing for the Minimum Elongation Percentage.

**41.**

In order to pass the test, Robbins kept sampling and testing until it obtained three tests that averaged to a passing result.

## Robbins Considers Re-Mixing the Product or Getting a Waiver

**42.**

As soon as the 35035 and 35029 compounds were mixed, the clock began ticking on the shelf life of these newly created compounds.

**43.**

Products 35029 and 35035 had to be shipped to Goodrich at approximately the same time, because Goodrich had to use them in quick succession during the manufacturing process.

**44.**

Additionally, since products 35029 and 35035 were the outermost layers of the sonar domes, Goodrich could not begin production of the domes until it received the compounds from Robbins.

**45.**

For weeks the Robbins employees discussed how to rectify the problem created when the 35035 product was made using the out-of-date Elastomag.

**46.**

One of the Robbins employees suggested at a meeting that Robbins call Goodrich and ask for a waiver that would allow it to use out-of-date product and still comply with the contract specifications.

**47.**

Chad Robinson, the Vice President of Sales for Robbins, and the sales representative for the Goodrich account, responded: "No, no, no. Don't call them with anything like that. Don't let them know we had an issue."

**48.**

Robbins also considered mixing a new batch of 35035.

**49.**

In order to manufacture a new batch of 35035, Robbins would need to buy a new batch of raw materials.  Brown was informed that the new raw materials would cost $40,000.00.

**50.**

Additionally, Product 35035 contained a biocide, Tributyltin Oxide, which is considered a hazardous waste and in fact has been banned by the International Maritime Organization.  Accordingly, Robbins could not simply throw the product away; in order to get rid of the product made with the out-of-date Elastomag, it would be required to follow strict disposal guidelines, which would make disposal expensive.

**51.**

Since the product contained several different ingredients, Brown was charged with telling the purchasing department what other ingredients would need to be purchased in order to make a new batch of compound.

**52.**

On April 17, 2009, Brown wrote an email entitled "Goodrich Raw Materials Needed ASAP," and included a list of ingredients that would need to be gathered together in order to allow Robbins to re-mix the Goodrich order.

**53.**

In response, on April 17, 2009, Robbins employee Ashley Mitchell wrote: "I am leaving to take care of some things for vacation. Once you have determined how much of this needs to be re-run to replace what was run with bad Elastomag, let Chad know the materials you will need ordered. Might want to make sure you have the COA's for everything and that nothing else is expired before letting him know what to order. He is on vacation today, but will be back on Monday." <u>See</u> emails, att. as Exh. 3.

**54.**

Despite the efforts of Brown and other employees, Robbins did not order the new ingredients or mix a new batch of 35035.

**Robbins Decides To Falsify Documents and to
<u>Knowingly Provide Non-Compliant Product for Use in the Sonar Domes</u>**

**55.**

On approximately May 15, 2009, Brown learned through comments at a staff meeting that the Robbins management was considering shipping the rejected

compound without the customer's consent or knowledge. Several employees objected to the idea, including Brown.

**56.**

Brown was out sick on June 1, 2 and 3, 2009. When he returned to work on June 4th, he was informed that Robbins in fact had shipped the non-compliant batch of 35035 to Goodrich in Florida.

**57.**

To confirm what he had heard, Brown reviewed the plant production records for the days he had been out, and the records did not show a new batch of 35035 being mixed.

**58.**

As part of the Government contract, and as part of the Goodrich contract, Robbins was required to maintain and submit documentation showing the ingredients that had been used in the manufacture of the rubber compounds. As part of this record-keeping, Robbins was required to include the lot number and the shelf life for each ingredient that went into the compounds.

**59.**

Robbins was required to retain the records for a minimum of one year.

**60.**

During the manufacturing process for a product such as the ones Robbins made for Goodrich, Robbins' process engineer or a member of the line crew handwrote the lot number for each ingredient on a form. These lot numbers were later entered into an Excel spreadsheet called the "CustoMix Lot Traceability Lab Report".

**61.**

Robbins prepared a "CustoMix Lot Traceability Lab Report" for the 35035 product provided to Goodrich. The Report correctly states that the shelf life of Elastomag 170 is 12 months.

**62.**

The Report also correctly states that the 35035 product for B.F. Goodrich was mixed on April 16, 2009, as does another document, the "Line #4 Shift Report."

**63.**

However, Robbins instructed employee Ray Morris to alter the lot number for the Elastomag 170 listed on the "CustoMix Lot Traceability Lab Report."

**64.**

On the "CustoMix Lot Traceability Lab Report," Robbins altered the Elastomag 170 lot number to read "Oct208WW22," in order to make it appear that

the Elastomag had been manufactured in 2008 instead of 2007, and therefore was still within its shelf life. In fact, however, the real lot number had included a "7" instead of an "8", indicating that the Elastomag was created in 2007, not 2008.

## 65.

Robbins altered the lot number in order to falsely claim that it had complied with the specifications under the contract.

## 66.

Additionally, when it sent the product to Goodrich, Robbins was required to certify that it had complied with all the specifications under the contract, which included the requirement that the materials be within the manufacturer's intended use date.

## 67.

Robbins certified that it had complied with all the specifications, when in fact Robbins was aware that it had used out-of-date Elastomag that did not meet the requirements under the contract.

## 68.

Robbins knew and intended that the information it was providing to Goodrich be used to prove compliance with Government requirements that related to the manufacture of the sonar dome.

**69.**

Brown went to Mike Henson, who was the plant manager and Brown's supervisor, to discuss why the product had been shipped when it had been made with bad Elastomag. The plant manager informed Brown, "It's not bad Elastomag, it's just out-of-date Elastomag."

**70.**

Henson told Brown: "That action was taken care of by David Draper, Derrik Hutcheson, and Steve Saucier," and informed Brown that he "should not concern" himself with the matter.

**71.**

Brown also discussed the issue with Shane Haygood, Robbins' quality assurance manager. Haygood said he had been upset when he found out that Robbins had shipped the product, because he had been under the impression that the company was going to remix the product. Haygood said, however, that by the time he learned that the product had been shipped, it was "all said and done," and he "said [his] piece and let it go."

**72.**

On June 17, 2009, Brown was informed that he would be laid off for a minimum of six weeks.

**73.**

Afterwards, Brown asked Ray Morris directly about why the wrong lot number had been put on the document. Ray Morris stated that Bill Brown, the lab manager, and Robbins' Director of Manufacturing, David Draper, had given him the number and told him to use it.

**74.**

Morris informed Brown that although the number was not the correct one for the product actually used, it was the number "they told me to use," and "I've got to play dumb."

**75.**

Brown asked Morris to tell him what the actual lot number had been, but Morris did not do so.

**76.**

Shortly thereafter, James Brown received a call from lab manager Bill Brown, who stated that in fact the altered lot number used on the document had come from David Draper, and that Bill Brown had had no choice but to use it. Bill Brown dropped his voice to a whisper and said that David Draper "took care of it where it wouldn't come back on me."

**77.**

James Brown again asked Ray Morris for the actual lot number, and Morris informed Brown that any further questions on the matter had to be directed to Mike Henson.

**78.**

With Ray Morris still present, James Brown called Mike Henson and requested the actual lot number.  Henson refused to provide the number.

### Robbins Terminates James Brown

**79.**

James Brown prepared a letter to Dan Crouse, the liaison between Gray Mountain Partners, a private equity group that partially owns Robbins, and Robbins.

**80.**

Brown drafted a letter to Crouse, which he showed to Robbins employee John McCoy on or about Friday, June 19, 2009.

**81.**

In the letter, Brown described the situation, detailing the use of the out-of-date material and the falsification of the lot number.  Brown told Crouse: "Goodrich nor the Department of Defense have been made aware of the situation."  Brown

requested that Crouse investigate his allegations within the next two weeks, and added: "If at that time I am not satisfied with results I will take up this issue with Goodrich and the DOD."  See Letter, att. as Exh. 4.

**82.**

On Friday, June 19, 2009, Mike Henson came to Brown's office and asked if there was anything he should know about Brown's "sudden interest" in the 35035 product that had been provided to Goodrich.  Henson stated that Ray Morris had approached Henson about Brown's interest in the issue.

**83.**

On Monday, June 22, 2009, before Brown could send his letter to Crouse, James Brown was asked to accompany David Draper to the conference room, where Derrik Hutcheson was waiting.  Draper stated that Robbins was placing Brown on suspension until further notice.   Draper stated that the suspension would be effective immediately, and that the reason for the suspension was that Brown had disrupted morale and made allegations about wrongdoing in a letter.

**84.**

James Brown attempted to contact Dan Crouse both by email and phone, but Crouse did not respond.

**85.**

On Wednesday, June 24, 2009, Robbins Human Resources Manager Cheryl James telephoned James Brown to inform him that his employment was being terminated.

**86.**

On Friday, June 26, 2009, Brown received a registered letter informing him that he was being terminated for "Gross Misconduct," which could and in fact did prevent him from obtaining unemployment benefits.

<u>**COUNT I**</u>

**RETALIATION AGAINST PLAINTIFF BROWN
UNDER THE FALSE CLAIMS ACT**

**87.**

Plaintiff incorporates by reference and re-alleges the previous paragraphs as if fully set forth herein.

**88.**

Brown was engaged in conduct protected under 29 U.S.C. § 3730 (h).

**89.**

Defendant Robbins was aware that Brown was engaged in conduct protected under 29 U.S.C. § 3730(h).

**90.**

In direct contravention of 29 U.S.C. § 3730(h), Defendant Robbins discharged Brown, and threatened, harassed and discriminated against him in the terms and conditions of his employment, because of lawful acts he did in furtherance of efforts to stop one or more violations of the False Claims Act, 31 U.S.C. § 3729, et seq.

**91.**

In direct contravention of 29 U.S.C. § 3730(h), Defendant Robbins discharged Brown, and threatened, harassed and discriminated against him in the terms and conditions of his employment, because of lawful acts he did in furtherance of an action under the False Claims Act, 31 U.S.C. § 3729, et seq., including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section.

**92.**

Brown suffered damages, including lost wages, special damages, and litigation costs and attorneys' fees, as a proximate result of Defendants' discharge of him, and Defendants' threats, harassment and discrimination against him.

## **PRAYER**

WHEREFORE, Plaintiff respectfully prays and demands the following:

(a)  That process issue and service be made upon Defendant to appear and answer this Complaint as provided by law;

(b)  That judgment be entered in favor of Plaintiff and against Defendant;

(c)  That Plaintiff be awarded all damages flowing from Defendant's wrongful acts;

(d)  That Brown be awarded attorneys' fees and expenses of litigation, pursuant to 31 U.S.C. § 3730;

(e)  That Brown be awarded all relief necessary to make him whole, including reinstatement with the same seniority status he would have had but for the discrimination, two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including medical insurance replacement premiums paid, and including litigation costs and reasonable attorneys' fees, pursuant to 31 U.S.C. § 3730;

(f)  That Plaintiff be awarded such other and further relief as is justified by the facts and law that this Court deems just and proper; and,

(g)  That Plaintiff be granted a trial by jury.

Submitted this 20th day of April, 2011.

COUNSEL FOR PLAINTIFF

**The Wallace Law Firm L.L.C.**


/s/ Lee Tarte Wallace____
LEE TARTE WALLACE
Georgia Bar No.:  698320

2170 Defoor Hills Road
Atlanta, Georgia 30318
(404) 814-0465


**LoRusso Law Firm, P.C.**


/s/ Lance LoRusso_____
LANCE LORUSSO
Georgia Bar No.:  458023

1827 Powers Ferry Road
Building 8, Suite 200
Atlanta, GA  30339
(770) 644-2378

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**

| | |
|---|---|
| JAMES D. BROWN, JR., | ) |
| | ) Civil Action File |
| *Plaintiff,* | ) No.: _____ |
| | ) |
| v. | ) |
| | ) JURY TRIAL |
| ROBBINS, LLC, | ) DEMANDED |
| | ) |
| *Defendant.* | ) **FILED UNDER SEAL** |
| | ) |
| _____ | ) |

## CERTIFICATE OF SERVICE

This is to certify that I have this date served counsel for the United States of America and for the State of Georgia with a copy of **AMENDED COMPLAINT** to:

*Counsel for the United States of America*

Dan Caldwell, Esq.
Assistant United States Attorney
United States Attorney's Office
Richard B. Russell Federal Building
75 Spring Street, SW - Suite 600
Atlanta, GA 30303-3309

Eric Holder, Esq.
Office of the Attorney General
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530-0001

Barry Armstrong
McKenna, Long & Aldridge
303 Peachtree Street, NE
Suite 5300
Atlanta, GA 30308-3265

This 20th day of April, 2011.

**THE WALLACE LAW FIRM, L.L.C.**

**/s/ Lee Tarte Wallace**
LEE TARTE WALLACE
Georgia Bar No.: 698320

2170 Defoor Hills Rd.
Atlanta, Georgia 30318
404-814-0465
Fax: 404-814-0540